AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | |
|---|---|
| United States of America<br>v.<br><br>MD Hossain Morshed<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.
      23-mj-2025 (AMD)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____ in the county of _____Atlantic_____ in the
_____ District of _____New Jersey_____ , the defendant(s) violated:

| Code Section | Description of Offenses |
|---|---|
| 52 USC 20511(2)(A);<br>18 USC 1001(a)(2);<br>18 USC 1343. | Fraudulent Procurement and Submission of Voter Registration Applications;<br>False Statements;<br>Wire Fraud.<br><br>See Attachment A |

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Ronald Viola, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:  __March 16, 2023__

_____
*Judge's signature*

City and state:  _____District of New Jersey_____

Hon. Ann Marie Donio, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Count 1
### (Fraudulent Procurement and Submission
### of Voter Registration Applications)

From on or about February 21, 2019 through on or about April 30, 2019, in the District of New Jersey and elsewhere, defendant

### MD HOSSAIN MORSHED,

in any election for federal office, did knowingly and willfully deprive, defraud, and attempt to deprive and defraud the residents of the State of New Jersey of a fair and impartially conducted election process by the procurement and submission of voter registration applications that were known by defendant MORSHED to be materially false, fictitious, and fraudulent under the laws of the State of New Jersey.

In violation of Title 52, United States Code, Section 20511(2)(A).

## Count 2
### (False Statements)

On or about December 22, 2021, in the District of New Jersey and elsewhere, defendant

**MD HOSSAIN MORSHED**

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Executive Branch of the government of the United States, namely a criminal investigation conducted by the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Section 1001(a)(2).

## Count 3
### (Wire Fraud)

From at least as early as in or around April 2020 through in or around September 2021, in the District of New Jersey and elsewhere, defendant

**MD HOSSAIN MORSHED**

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures and sounds.

In violation of Title 18, United States Code, Section 1343.

4

**ATTACHMENT B**

I, Ronald Viola, am a Special Agent of the FBI.  The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including surveillance, business records, bank records, and other documents.  Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation.  Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.  Conversations and communications where speakers are quoted herein were lawfully recorded by law enforcement.

**The Defendant and Relevant Entities and Overview of Voter Registration and Vote-By-Mail Requirements in New Jersey**

1.    At all times relevant to this Complaint:

a.    Defendant MD Hossain Morshed ("MORSHED") was a Councilperson who served on the City Council of Atlantic City, New Jersey, as a representative of the Fourth Ward.  MORSHED was elected on or about November 5, 2019 to serve a four-year term.

*Voter Registration*

b.    The 2019 election in Atlantic County included countywide races for the General Assembly (Second Legislative District), County Executive, Freeholder-at-Large,[1] and Freeholder District 1, as well as races in Atlantic City for Councilpersons in Wards One through Six, and three seats on the Atlantic City Board of Education.  A primary election was held on or about June 4, 2019, and a general election was held on or about November 5, 2019.

c.    In order to vote in an election for federal, state, or local offices, New Jersey residents, including residents of Atlantic City, were required to register to vote with New Jersey's Division of Elections.  A prospective voter registered to vote by completing a New Jersey Voter Registration Application (the "Voter Registration Application"), on which the prospective voter provided, among other information, their name, date-of-birth, home address, and last

---

[1] In 2020, New Jersey enacted legislation requiring the title of "chosen freeholder" to be changed to "county commissioner" and all "boards of chosen freeholders" to be changed to "boards of county commissioners."

address at which the prospective voter was registered to vote.  In addition, the Voter Registration Application required the prospective voter to declare under penalty of punishment that the prospective voter lived at the address written or typed into the form and further "resided in the State and county at least 30 days before the next election."

d.    A prospective voter would submit the completed Voter Registration Application either online, or by mailing or hand-delivering it to the County Commissioner of Registration or Superintendent of Elections for the county in which the prospective voter resided.

e.    If the prospective voter was unable to complete the Voter Registration Application on their own, the prospective voter could enlist another individual to assist the prospective voter in completing the Voter Registration Application.  The name and address of the individual who assisted the prospective voter to complete the Voter Registration Application was required to be printed on the Voter Registration Application.

f.    Pursuant to New Jersey Statutes Annotated (N.J.S.A.) § 1:31-5, in order to lawfully register to vote in a particular voting district, a prospective voter was required, among other qualifications, to reside in the district in which the prospective voter intended to vote, and, at the time of the election, to have fulfilled all the requirements as to length of residence to qualify as a legal voter.

g.    Further, according to N.J.S.A. § 1:31-5, once registered, the prospective voter was not required to register again in such district as long as the prospective voter continued to reside in that district.  Regarding future elections, the prospective voter was eligible to vote in any election held subsequently to such registration, provided that the prospective voter was a citizen of the United States, was at least 18 years old, and was a resident of New Jersey and of the county in which the registration was filed for at least 30 days prior to the election.

h.    In New Jersey, pursuant to N.J.S.A. § 19-34-1, it was a felony offense to willfully cause or procure the name of any person to be registered to vote, knowing that such person was not entitled to vote in an election district where such person was not entitled to vote in the next election to be held in that district.

*Mail-In Ballots*

i.    Registered voters in New Jersey could apply to vote a ballot by mail by completing an Application for Vote-By-Mail Ballot ("Vote-By-Mail Application") and returning the Vote-By-Mail-Application by mail or hand-delivery to the County Clerk's Office in the registered voter's county of residence.  Alternatively, a registered voter could apply for a mail-in ballot by

authorized messenger.  Through that process, the registered voter would designate one authorized messenger by name on the Vote-By-Mail Application. That authorized messenger subsequently could deliver the completed Vote-By-Mail Application to the County Clerk's Office in the registered voter's county of residence on behalf of the registered voter.

j.      Thereafter, if the registered voter was approved to vote by mail, the authorized messenger could also obtain from the County Clerk's Office the mail-in ballot for the registered voter and then deliver that ballot to that voter.  Once the registered voter completed the mail-in ballot, the authorized messenger could return it on behalf of the registered voter by placing it into a secure ballot drop box or delivering it in-person to the registered voter's county Board of Elections Office.

k.      If a registered voter did not designate an authorized messenger on their Vote-By-Mail Application, once the application was approved, the registered voter would receive a mail-in ballot in the mail.  The registered voter would complete the mail-in ballot and return it by mailing it, placing it into a secure ballot drop box, or delivering it in-person to the registered voter's county Board of Elections Office.

l.      An authorized messenger was required either to be a family member of the registered voter or, in Atlantic County, a registered voter of Atlantic County.  An individual could serve as an authorized messenger for no more than three qualified voters per election.[2]

**MORSHED's Falsification of Voter Registration and Mail-In Ballot Applications**

*MORSHED's Meetings with Prospective Voter ("PV 1") in or around April 2019*

2.      In or around April 2019, MORSHED met with a prospective voter ("PV 1") in or around Atlantic City and provided PV 1 a Voter Registration Application which MORSHED asked PV 1 to sign in advance of the primary election to be held on or about June 4, 2019.  Almost all the information on the application form had been completed prior to the time MORSHED handed it to PV 1 and asked for PV 1's signature.  Only the registrant's New Jersey driver's license number and signature were blank.  MORSHED asked PV 1 for PV 1's driver's license number and MORSHED wrote this number on the Voter Registration Application.  Shortly thereafter, PV 1 signed the form.  On or

---

[2] Vote-By-Mail Applications subsequent to 2019 expanded the number of registered voters for whom an individual could be designated an authorized messenger to five qualified voters if they were immediate family members residing in the same household as the authorized messenger.

about April 29, 2019, the Atlantic County Superintendent of Elections received the Voter Registration Application signed by PV 1.

3. PV 1 never resided at the Atlantic City address written in the Home Address section of the Voter Registration Application (the "Atlantic City Address"), which address was located in Atlantic City's Fourth Ward. Instead, PV 1 resided in or around Galloway, New Jersey, at an address outside of the Atlantic City voting district.

4. In or around April 2019, MORSHED met with PV 1 again, this time, at PV 1's residence in or around Galloway. MORSHED asked PV 1 to sign a Vote-By-Mail Application that already was partially completed, including listing the Atlantic City Address as the "Address at which you are registered to vote." According to PV 1, PV 1 declined to sign the application and told MORSHED that the Atlantic City Address was not PV 1's residence and that PV 1 believed that it would be illegal for PV 1 to sign the form.

5. MORSHED visited PV 1's Galloway residence on approximately two other occasions in or around April 2019 to convince PV 1 to sign the Vote-By-Mail Application that listed the Atlantic City Address as PV 1's address at which PV 1 was registered to vote. According to PV 1, during one of these visits, MORSHED showed PV 1 a stack of Vote-By-Mail Applications that appeared to bear the signatures of other individuals and told PV 1 that it was legal for PV 1 to sign the Vote-By-Mail Application that MORSHED had provided to PV 1. MORSHED further told PV 1 that MORSHED owned the property located at the Atlantic City Address. During one of these visits, MORSHED told PV 1 that when MORSHED won election to the Atlantic City Council, MORSHED would get PV 1 a job in Atlantic City government. Following this conversation, PV 1 signed the Vote-By-Mail Application that falsely listed the Atlantic City Address as PV 1's address at which PV 1 was registered to vote. After PV 1 signed the Vote-By-Mail Application, MORSHED took it and said he would mail it for PV 1.

6. In addition to the Atlantic City Address, the Vote-By-Mail Application signed by PV 1 included another Atlantic City address (the "Second Atlantic City Address") in another section of the form titled: "Mail my ballot to the following address." The Second Atlantic City Address, which was also within Atlantic City's Fourth Ward, was located near to, but was different from, the Atlantic City Address, and, like the Atlantic City Address, PV 1 never resided there.

7. As reflected in records maintained by the Atlantic County Superintendent of Elections Office, a mail-in ballot in the name of PV 1 was mailed to the Second Atlantic City Address on or about May 15, 2019. Less than two weeks later, on or about May 28, 2019, the Atlantic County Board of Elections received PV 1's completed mail-in ballot, which was counted towards

8

the primary election on or about June 17, 2019. According to PV 1, PV 1 did not receive, complete, or return the mail-in ballot.

8.  MORSHED met with PV 1 on another occasion in or around June or July 2019 and asked PV 1 to complete a Voter Registration Application changing PV 1's home address from the Atlantic City Address to PV 1's correct residence in or around Galloway. PV 1 filled out a new Voter Registration Application listing PV 1's correct residence in the section of the form titled: "Home Address" and listing the Atlantic City Address in the section of the form titled: "Last Address Registered to Vote." PV 1 signed this form and handed it to MORSHED. On or about July 10, 2019, the Atlantic County Superintendent of Elections received this follow-up Voter Registration Application from PV 1.

*Telephone Conversation Between MORSHED and PV 1 on or about August 11, 2022*

9.  On or about August 11, 2022, in a lawfully recorded telephone call that PV 1 made at the direction of law enforcement,[3] PV 1 spoke with MORSHED and informed MORSHED that law enforcement officers had visited PV 1's Galloway residence and told PV 1's daughter that the law enforcement officers had questions about PV 1 "voting in Galloway and Atlantic City." In response, MORSHED told PV 1 that if PV 1 should be questioned again by law enforcement, PV 1 should say that in 2018 and the beginning of 2019, PV 1 resided in Atlantic City and did not change the address on PV 1's driver's license because the Atlantic City Address was PV 1's daughter's house. MORSHED further told PV 1 to tell law enforcement that PV 1 was working in Atlantic City and had "a place in Atlantic City and some time I live in Atlantic City, some time I live in Galloway." MORSHED also told PV 1 to say that PV 1 lived part of the time in Atlantic City and the rest of the time in Galloway. All of these representations that MORSHED advised PV 1 to make to law enforcement would have been false. MORSHED assured PV 1 that PV 1 "can make a voter registration any place but it has to be that one place. You cannot do the voter registration in two places. . . . And this is one-hundred percent legal. This is nah nothing is illegal."

10.  Although PV 1 did not receive the mail-in ballot delivered to the Second Atlantic City Address (referenced above in paragraph 7), during the course of the August 11, 2022 telephone conversation MORSHED told PV 1 that if PV 1 were asked by law enforcement about the mailing of the completed ballot, PV 1 should tell law enforcement that PV 1 received the ballot, sealed the ballot, and subsequently mailed the completed ballot. MORSHED reiterated to PV 1, "you are not doing anything wrong. Nothing will happen.

---

[3] All subsequent conversations between PV-1 and Morshed that are referenced herein were engaged in at the direction of law enforcement.

Don't worry whatever I tell you they gonna ask you the same question, you gonna give the answer."

*Telephone Conversation Between MORSHED and PV 1 on or about August 29, 2022*

11.     On or about August 29, 2022, PV 1 spoke to MORSHED again by telephone.  During this lawfully recorded phone call, PV 1 told MORSHED that law enforcement officers questioned PV 1 about the Atlantic City Address, the Second Atlantic City Address, and the voting forms MORSHED had earlier brought to PV 1 for PV 1 to sign.  PV 1 further told MORSHED that on this occasion law enforcement officers had warned PV 1 that it was illegal for an individual to provide an address on a voter registration form if the individual did not actually live at the address indicated on the form.  In response, MORSHED told PV 1: "no, no no, you can make your voter registration any place, but you have to pick the one place. . . . If anything, you just tell them . . . you filled out the application."  MORSHED asked PV 1 to meet him later that day in Atlantic City to discuss further PV 1's concerns about the questions posed by law enforcement.

*In-Person Meeting Between MORSHED and PV 1 on or about August 29, 2022*

12.     Several hours later, on or about August 29, 2022, PV 1 met with MORSHED in or around Atlantic City.  PV 1 brought PV 1's Voter Registration Application and Vote-By-Mail Application to this meeting.  During the meeting, which was lawfully-recorded, MORSHED and PV 1 reviewed these documents and MORSHED encouraged PV 1 to tell law enforcement during any subsequent conversations that might occur that PV 1 resided at the Second Atlantic City Address.  Specifically, MORSHED told PV 1: "You was living [street number for the Second Atlantic City Address] . . . this is empty house. . . . Um, this still it is empty. . . . This is my uncle house. . . . Yeah, empty, it still was empty, it is still empty.  It, that's why I told you to come over there then I can show you brother. . . . you tell them listen, I make that I was living [at the Second Atlantic City Address]."

13.     In response to MORSHED's instructions to provide the Second Atlantic City Address as PV 1's address to law enforcement, PV 1 told MORSHED that law enforcement ultimately would learn that PV 1 resided in Galloway.  MORSHED responded: "It doesn't make any, any things.  You number one, you can make the voter registration, you not registered any places.  Anywhere. Alaska, Siberia, uh Margate, Longport, Atlantic City, Absecon, any places . . . Number one.  And number two, this is for the mail-in ballot.  Okay. This is for the mail, mail-in ballot form, you tell them I was living over there all the time.  I do not stay at my house because my family living here.  I had some problem with my wife, so sometimes I would stay this house."

10

14.    When PV 1 reminded MORSHED that PV 1 had only signed, not filled out, the Voter Registration Application and Vote-By-Mail Application, MORSHED responded: "don't say that this is not your writing.  Then it's gonna raise more question . . . you gonna say, 'I filled it out, everything.  This is my address and I gave it [to] the election commission office and who's name is over there?  I don't know anything.  Ask the election commission.' . . . You just tell them, if they come again, 'listen, I filled out the application, I gave it to the election commission office, I don't know after that anything.  And they said, who's this person?  Listen, listen man, I don't know anything, I drop at the election commission office.'"

15.    Later in the conversation, MORSHED told PV 1: "You know, listen, if I didn't have a good relation with you who I know and me was driving taxi, you shouldn't take this kind of risk for me.  You didn't take this kind of headache for me. . . . Who else would take this kind of headache?"

**MORSHED's False Statements to the FBI**

*December 22, 2021 FBI Interview of MORSHED*

16.    On or about December 22, 2021, in or around Atlantic City, MORSHED was approached by FBI agents.  FBI agents asked MORSHED whether he would be willing to speak with them and told MORSHED that speaking with the FBI agents was voluntary.  The FBI agents also warned MORSHED that lying to federal law enforcement agents was a crime.  Thereafter, MORSHED agreed to speak with and made numerous materially false statements to the FBI.

17.    Specifically, when asked by FBI agents if he had ever provided a blank Voter Registration Application or blank Vote-By-Mail Application to a prospective voter, MORSHED stated that he had not.

18.    FBI agents then showed MORSHED a blank Voter Registration Application and a blank Vote-By-Mail Application[4] to ensure that MORSHED understood what documents the FBI agents were asking him about.  After being shown the documents, MORSHED maintained that he never provided any such documents to any prospective voter, never assisted any prospective

---

[4] The blank Voter Registration Application and blank Vote-By-Mail Application that the FBI showed to Morshed were forms issued by New Jersey Division of Elections in 2020 and 2021, respectively.  Other than certain minor differences, these documents—including the headers—are the same as the Voter Registration Application and Vote-By-Mail Application used by the New Jersey Division of Elections in 2019.

voter in filling out such documents, and never collected any such documents from any prospective voter.

19. When asked by the FBI agents if MORSHED had ever asked residents of municipalities outside of Atlantic City, including among others, Galloway, to register to vote in Atlantic City's Fourth Ward even though those residents had neither moved to nor resided in Atlantic City, MORSHED responded that he had not.

*Statements of Prospective Voters that are Inconsistent with MORSHED's Statements to the FBI*

20. A second prospective voter ("PV 2") stated that in connection with MORSHED's race in 2019 for a seat on the Atlantic City Council, MORSHED approached and provided PV 2 with a Voter Registration Application and a Vote-by-Mail Application. MORSHED asked PV 2 to write PV 2's name and date of birth on the Voter Registration Application and to sign the Voter Registration Application. PV 2 stated that MORSHED filled out other portions of the Voter Registration Application, including writing an address on the Voter Registration Application of a residence that PV 2 owned but at which PV 2 did not reside. According to PV 2, MORSHED further told PV 2 during this conversation that after the election, PV 2 could change PV 2's registration address back to the address where PV 2 resided. Additionally, PV 2 stated that MORSHED filled out the Vote-By-Mail Application in the presence of PV 2 and asked PV 2 to sign the bottom of the form. Once the Voter Registration Application and Vote By Mail Application were completed, PV 2 gave the forms back to MORSHED.

21. A third prospective voter ("PV 3") stated that in connection with MORSHED's race in 2019 for a seat on the Atlantic City Council, MORSHED provided PV 3 with a Voter Registration Application and a Vote-By-Mail Application, told PV 3 to fill out the forms and what address to include on the forms. Once the Voter Registration Application and Vote By Mail Application were completed, PV 3 returned the forms to MORSHED.

22. A fourth prospective voter ("PV 4") stated that in connection with MORSHED's race in 2019 for a seat on the Atlantic City Council, MORSHED provided PV 4 with a blank Voter Registration Application and Vote-By-Mail Application. PV 4 stated that MORSHED asked PV 4 to sign PV 4's name at the bottom of the blank forms, which PV 4 did. Additionally, PV 4 stated that PV 4 gave the Voter Registration Application and Vote-By-Mail Application to MORSHED after PV 4 signed the forms.

23. As reflected in records maintained by the Atlantic County Superintendent of Elections Office, mail-in ballots in the names of PV 2, PV 3, and PV 4 were mailed to the addresses listed on the Vote-By-Mail Applications

that were submitted under their respective names.  Records maintained by the Atlantic County Superintendent of Elections further indicate that PV 2's and PV 4's completed mail-in ballots were each accepted and counted towards the primary election on or about June 17, 2019.  However, although PV 3's mail-in ballot was received by the Atlantic County Board of Elections, it was rejected on or about June 14, 2019 and not counted towards the primary election.

24.    The Atlantic County Superintendent of Elections did not receive follow-up Voter Registration Applications or any other submission from PV 2, PV 3, or PV 4 notifying it of a change to those respective voters' addresses as reflected in the portion of the Voter Registration Application titled: "Home Address" until a date after the 2020 primary election, which was an election for federal office.

**Fraudulent Unemployment Benefits Claims Submitted by MORSHED**

25.    On or about January 1, 2020, MORSHED was sworn in as a Councilperson on the Atlantic City Council, representing the Fourth Ward.  As a council member, MORSHED earned an annual salary of approximately $27,800 and received his first bi-weekly payment in the amount of approximately $1,068.90 on or about January 24, 2020.  Since on or about that date, MORSHED has received bi-weekly salary payments up to and through on or about December 23, 2022 of no less than $1,068.90.

26.    On or about April 5, 2020, MORSHED submitted an application to the New Jersey Department of Labor and Workforce Development ("NJDOL") for expanded unemployment benefits available to qualifying recipients during COVID-19 titled: New Jersey Pandemic Unemployment Assistance ("NJ-PUA").[5] On that application, MORSHED listed as his "main occupation" "TAXI DRIVERS AND CHAUFFEURS."  In describing this job, MORSHED wrote, as follows: "DRIVE AUTOMOBILES, VANS, OR LIMOUSINES TO TRANSPORT PASSENGER MAY OCCASIONALLY CARRY CARGO.  INCLUDES HEARSE

---

[5] According to the New Jersey Department of Labor and Workforce Development, Division of Unemployment Insurance ("Division of Unemployment Insurance"), until its expiration on or about September 4, 2021, NJ-PUA provided benefits to New Jersey workers who were: (i) not eligible for unemployment benefits in any state, including self-employed workers; (ii) otherwise able and available to work except that they were unemployed, partially unemployed, or unable or unavailable to work due to a COVID-19 qualifying reason; and (iii) able to demonstrate labor market attachment, through prior wage history in 2019 or 2020 prior to the point the worker was impacted by the pandemic or a bona fide offer of work that was to begin during the pandemic, but could not due to the pandemic.

DRIVERS." On the application, MORSHED further stated that the last date he worked in this position was March 15, 2020.

27.    If an individual maintained employment during the pandemic that resulted in weekly income in an amount exceeding $277, that individual would not be entitled to any unemployment benefits from the State of New Jersey during that period. In order to determine the amount an individual could receive under NJ-PUA, the Division of Unemployment Insurance calculated a prospective beneficiary's benefit level based on the income the prospective beneficiary received in the last completed tax year before the prospective beneficiary filed a claim. Based on his weekly salary as a councilperson, MORSHED was not entitled to NJ-PUA benefits.

28.    Additionally, NJ-PUA recipients also were eligible for an extra benefit payments through Federal Pandemic Unemployment Compensation ("NJ-FPUC") and the Lost Wages Assistance Program ("NJ-LWAP"). Most workers who were unemployed during the pandemic were eligible for unemployment insurance benefits through NJ-FPUC and NJ-LWAP. Based on his weekly salary as a councilperson, MORSHED was not entitled to benefits through NJ-FPUC or NJ-LWAP.

29.    Once an individual was approved to receive NJ-PUA, NJ-FPUC, and NJ-LWAP benefits, the NJDOL required that individual to affirm electronically, on a weekly basis, whether he or she had worked that week, and, if the individual had worked, how much income the individual had earned that week. From on or about May 16, 2020, the date on which MORSHED submitted his first weekly certification for prior weeks' benefits obtained on or about April 11, 18, 25, and May 2, and 9, 2020, through on or about September 8, 2021, the date on which MORSHED submitted his last weekly certification for benefits obtained on or about September 4, 2021, MORSHED certified that he had neither worked nor earned any income in the preceding weeks on all but one of these electronic submissions to the NJDOL. During this period, MORSHED falsely represented on approximately 69 certifications that he had not worked during the reporting period during which he was certifying his employment and income status.

30.    However, records obtained by law enforcement confirmed that from on or about January 24, 2020 through the present, MORSHED was paid, without exception, no less than $1,068.90 every two weeks for his position as a Councilperson for Atlantic City Council's Fourth Ward. Accordingly, MORSHED electronically affirmed with the NJDOL that he had not worked or earned income, notwithstanding the fact that at the time he submitted those affirmations he was receiving a bi-weekly salary as compensation for his role as a Councilperson.

14

31.    Additionally, on or about February 9, 2020, MORSHED created an account with a ride-sharing company ("Company-1") to work as a driver.  On or about March 13, 2020, MORSHED created an account with another ride-sharing company ("Company-2," and collectively with Company-1, the "Ride-Sharing Companies") to work as a driver.

32.    Records obtained by law enforcement confirmed that from on or about August 17, 2020 through on or about September 20, 2021, a period commencing more than four months after he applied for unemployment benefits, MORSHED periodically worked for the Ride-Sharing Companies, and earned income from both.  The work that MORSHED performed for the Ride-Sharing Companies, and the corresponding income that he earned, corresponded with weeks where MORSHED electronically affirmed with the NJDOL that he had not worked or earned any income.  For example, on or about August 24, 2020, MORSHED worked for and earned approximately $1,562.21 driving for Company-1.  Additionally, on or about September 4, 2020, MORSHED was paid $1,068.90 by the City of Atlantic City for his work as a Councilperson in the Fourth Ward, including for the week of August 24, 2020.  However, on or about August 30, 2020, MORSHED electronically certified to NJDOL that he had not worked the previous week.

33.    From on or about April 11, 2020 through on or about September 4, 2021, when the NJ-PUA, NJ-FPUC, and NJ-LWAP benefits had expired for all eligible beneficiaries, MORSHED collected a total of approximately $39,208 in unemployment benefits to which he was not entitled.

34.    MORSHED received weekly payments through direct deposit from the State of New Jersey for his NJDOL unemployment benefits.  Those direct deposit payments were transmitted by wire communications from servers located in the States of Virginia or Colorado to MORSHED'S bank account located in the State of New Jersey.

_____
Ronald Viola, Special Agent
Federal Bureau of Investigation

Special Agent Viola attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this __16__ th day of March 2023.

_____
Hon. Ann Marie Donio
United States Magistrate Judge

15